UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____

|  |  |
|---|---|
| ) | |
| ) | |
| MIRABELLA MONTERIO, ) | |
| *Plaintiff* ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| ABA CENTERS OF AMERICA, LLC, ) | |
| ICBD HOLDINGS, LLC, ) | |
| DAVID CURRAN & ELIZABETH ROSARIO, ) | |
| *Defendants* ) | |
| ) | |

_____

## COMPLAINT & DEMAND FOR JURY TRIAL

1.     The plaintiff, Mirabella Monterio, complains against her former employers, ABA Centers of America, LLC (ABACA) and ICBD Holdings, LLC (ICBD), for violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq*.; the Pregnant Workers' Fairness Act (PWFA), 42 U.S.C. § 2000gg *et seq*.; the Law Against Discrimination, RSA ch. 354-A; the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq*.; RSA chapter 275; and the Whistleblower Protection Act, RSA ch. 275-E. She also complains against her supervisors, David Curran and Elizabeth Rosario, for aiding and abetting ABACA and ICBD in their unlawful discrimination and retaliation.

2.     Monterio internally reported that, due to ABACA's illegal policy, it was failing to pay her for certain hours she spent traveling between client

appointments during the workday. She also told the defendants that she was pregnant, and repeatedly requested a temporary modification to her schedule as an accommodation for her pregnancy-related symptoms. In response, the defendants ignored her requests for a reasonable accommodation, and they demoted her from full-time to part-time status. Shortly thereafter, ABACA constructively discharged Monterio when it purposefully failed to schedule her enough part-time hours (despite her desire to work full-time), such that it became financially impossible for Monterio to work there.

3.      As a result of the defendants' discriminatory and retaliatory conduct, Monterio suffered lost income, lost work opportunities, emotional distress, and embarrassment.

## PARTIES

4.      Monterio is a female individual who lives in Massachusetts.

5.      ABACA is a Delaware limited liability company with a principal office at 110 East Broward Boulevard, Suite 1100, Fort Lauderdale, Florida.

6.      ICBD is a Florida limited liability company with a principal office at 110 East Broward Boulevard, Suite 1100, Fort Lauderdale, Florida.

7.      David Curran is an individual who lives in New Hampshire. He is the Executive Director of ABACA's Nashua, New Hampshire clinic.

8.      Elizabeth Rosario is an individual who lives in New Hampshire. She the Director of Operations of ABACA's Nashua, New Hampshire clinic.

## JURISDICTION & VENUE

9.    The Court has subject matter jurisdiction over Monterio's Title VII and PWFA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5.

10.    The Court has subject matter jurisdiction over Monterio's FLSA claims pursuant to 28 U.S.C. § 1331.

11.    The Court has subject matter jurisdiction over Monterio's state law claims pursuant to 28 U.S.C. § 1367(a) because they arise out of the same factual transaction or occurrence as her federal claims.

12.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the claims arise out of the defendants' conduct at ABACA's Nashua clinic.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.    On August 9, 2024, Monterio timely filed a charge of discrimination against the defendants in the New Hampshire Commission for Human Rights (HRC), and she cross-filed the charge with the United States Equal Employment Opportunity Commission (EEOC).

14.    The charge was pending before the HRC for more than 180 days.

15.    On May 23, 2025, the HRC dismissed it without prejudice.

16.    On June 2, 2025, the EEOC sent Monterio a right-to-sue letter.

17.    Monterio is not required to exhaust administrative remedies before filing her state or federal wage claims.

## FACTS

### I.    Background

18.    ABACA provides applied behavioral analysis therapy to people with autism spectrum disorder.

19.    It owns and operates a clinic, where it provides these services, in Nashua, New Hampshire.

20.    ICBD is a collective of pioneering enterprises, each dedicated to reshaping the landscape of behavioral healthcare.

21.    ABACA and ICBD each employ more than fifteen employees, engage in interstate commerce, and have an annual gross volume of sales made or business done in excess of $500,000.

22.    ICBD is affiliated with, has control over, and participates in ABACA's management, operations, and employment decisions.

23.    On March 2, 2023, ICBD sent Monterio a letter stating that it "is with great pleasure that ICBD Holdings, LLC offers you a position as a Registered Behavioral Technician with ABA Centers of America."

24.    On May 22, 2023, Monterio began working at ABACA's Nashua clinic as a full-time registered behavioral technician ("RBT").

25.    Monterio's regular pay was $30.00 per hour.

26.    As a full-time employee, she was guaranteed to be scheduled at least thirty hours per week. She was also entitled to participate in ABACA's

benefits program, which included medical, dental, vision, and life insurance; 401(k) benefits; and other benefits described in ABACA's benefits package.

27.    As an RBT, Monterio worked with clients in their homes, schools, and communities, to implement individualized behavioral treatment plans that were prepared in advance for each client.

28.    Because Monterio worked in various locations, she was required to travel between client appointments during the workday.

29.    When she began working at ABACA, Monterio was required to work twenty client-facing hours to maintain full-time status.

30.    When Monterio was not meeting with clients, she worked at one of ABACA's clinics to perform administrative tasks, complete professional training, and prepare for client appointments.

31.    Curran and Rosario were Monterio's supervisors.

## II.    Monterio was highly regarded at work until she reported concerns about her pay and announced her pregnancy.

32.    During the first six months of her employment, Monterio was regarded an exemplary employee.

33.    On her November 2023 performance evaluation, Monterio received an overall score of "1 high high"—the highest score she could receive.

34.    Because Monterio received this score, she received a bonus from ABACA for her performance.

35.     Monterio's November 2023 performance evaluation states that she "[m]eets all [and] exceeds some" expectations, or "exceeds expectations" in substantially every metric by which ABACA evaluated its RBTs. It also states that Monterio "is an amazing RBT. Very knowledgeable and caring not only of the clients but her team as well. She is a great asset to [ABACA]."

36.     Attitudes towards Monterio changed in December 2023. Around that time, Monterio emailed ABACA's human resources department to report that ABACA was failing to pay her for certain time spent traveling during the workday. She also told Rosario that she was pregnant.

37.     In response, Rosario and her assistant, Laura Vaillancourt, began falsely claiming that Monterio was not working enough client-facing hours to maintain full-time status. They repeatedly threatened to demote Monterio to part-time status in retaliation for raising concerns about her pay and for requesting reasonable accommodations related to her pregnancy.

## III.    ABACA intentionally instructed Monterio to clock-out during the workday so that it did not have to pay her for time spent traveling between client appointments.

38.     When Monterio began working at ABACA, she was instructed to clock-out whenever there was a gap of time between client appointments.

39.     For example, on Mondays, Monterio would begin her day by meeting at a client's school in Chelmsford, Massachusetts from 7:45 a.m. to 12 p.m., at which time she was required to clock-out. Then she would be "sent

home" for a brief period before she made the forty-five minute drive—off the clock—to her next 2 p.m. client appointment in Weston, Massachusetts.

40.    ABACA intentionally scheduled similar gaps throughout Monterio's weekly schedule.

41.    With these gaps in place, ABACA required Monterio to clock-out after one client appointment ended, and it did not permit her to clock-in until the beginning of her next client appointment.

42.    As a result, Monterio travelled to client appointments during the workday without being compensated for her time.

43.    Monterio's supervisors explained that she was being "sent home" during these gaps in the workday before she returned to work for her next client appointment on the same workday. In these circumstances, ABACA essentially devised a system that required Monterio to "commute" to work without compensation multiple times per day.

## IV.    Monterio engaged in protected conduct by asking ABACA to compensate her for the time she spent traveling to client appointments during the workday.

44.    In late November or early December 2023, Monterio spoke with her managers, Gisela Zayas, Patrick Schrage, and Yarymar Martinez, in the lobby of ABACA's Nashua clinic. She asked about ABACA's policy on paying employees for time spent travelling between client appointments during the

workday, and she told them that she believed she was entitled to be paid for that travel time.

45.    Zayas responded that Monterio should remain clocked-in for travel time between client appointments, stating that ABACA wants to compensate its workers and make sure that they are getting paid what they are owed.

46.    Schrage and Martinez heard Zayas' answer, and they did not contest or correct her statement.

47.    Based on this information, Monterio sent an email to ABACA's human resources department on December 5, 2023, stating:

> I had met with my management team last week regarding staying clocked in during transition from client to client. I was not aware of this until a colleague had mentioned it and I confirmed with management. I wanted to reach out to the HR team regarding this issue to see if there is a possibility that I will be able to be compensated for those missed times. I appreciate your time. Please advise.

48.    The human resources department did not respond to this email.

49.    Instead, Curran called Monterio to interrogate her about her email, and he demanded to know the management team members who advised her to remain clocked-in between client appointments.

50.    Moments later, Monterio received another call from Rosario, who demanded to know the name of the colleague who told Monterio she should remain clocked-in between client appointments.

51.     Rosario instructed Monterio that she may remain clocked-in for time spent traveling to client appointments only if she was leaving an ABACA clinic and traveling directly to another client apartment, or if she was traveling directly from one client appointment to another client appointment. Otherwise, Monterio was required to clock-out at the conclusion of her first appointment and clock-in at the beginning of her next one.

52.     Several weeks later, Schrage approached Monterio and told her that Curran and Rosario reacted in this manner because they were upset that Monterio contacted the corporate human resources department directly.

53.     Monterio has not been paid for any of the hours she spent traveling between client appointments during the workday since June 5, 2023 —the day she first began working directly with clients.

## V.    Monteiro announced her pregnancy to her supervisors.

54.     In December 2023, Monterio learned that she was pregnant.

55.     From the outset, she suffered extreme nausea and vomiting, and she was prescribed medication to treat these symptoms.

56.     On December 20, 2023, Monterio told Rosario she was pregnant.

57.     She also told Rosario that she was experiencing extreme pregnancy-related symptoms.

58.     Rosario congratulated Monterio and explained that they would talk later in the year to discuss Monterio's parental leave.

**VI.    The defendants conspired to discriminate and retaliate against Monterio on account of her protected conduct and status.**

59.    As Rosario's assistant, Vaillancourt was responsible for setting RBTs schedules with input from Rosario.

60.    Vaillancourt worked directly under the supervision of Rosario, and her actions were directed by Rosario.

61.    Rosario directed Vaillancourt to harass Monterio about her schedule because Monterio was pregnant and because she raised concerns about her compensation.

62.    Upon information and belief, Curran knew about Rosario's plan to discriminate and retaliate against Monterio on account of her pregnancy, and he permitted it to continue in retaliation for Monterio's email to human resources about ABACA's failure to compensate her.

**A.    Vaillancourt falsely accused Monterio of failing to work enough hours to maintain her full-time status.**

63.    On December 27, 2023—one week after Monterio announced her pregnancy and about three weeks after she emailed human resources about her pay—Vaillancourt asked Monterio to add a new client to her schedule.

64.    Monterio originally agreed to take on the new client because Vaillancourt said the client lived in Andover, Massachusetts, which is near Monterio's residence. Monterio subsequently learned that the new client lived in Arlington, Massachusetts—not Andover.

65.     Monterio immediately told Vaillancourt that she could not take on the new client, stating: "I've had some medical discoveries on my end that has been making driving very hard for me temporarily, especially with [the Weston client] already. I just can't take on another client that far away, when we talked [you] were saying Andover."

66.     On January 10, 2024, Vaillancourt messaged Monterio about the Arlington client. Vaillancourt said—for the first time—that she tried to schedule Monterio with the Arlington client "to increase [her] hours to maintain fulltime [sic] status."

67.     During this message exchange, Vaillancourt explained that full-time employees must work a "minimum of 20 client facing hours," and are "guaranteed 30 hours and benefits," whereas part-time workers "can work up to 20" hours but have "no [hours] guaranteed and no benefits."

68.     By telling Monterio that she needed to increase her hours to maintain full-time status, Vaillancourt essentially told Monterio that she was failing to work twenty client-facing hours per week.

69.     No one had ever before told Monterio that she was not satisfying the requirements to maintain full-time status.

70.     This is because, at all times up to that point, Monterio worked twenty-one client-facing hours on a regularly scheduled week.

71.     Monterio told Vaillancourt she was working more than twenty client-facing hours. Vaillancourt responded: [O]k, I will look into this further and keep an eye on it. [I]f you'd like to come in and talk with Liz and I [sic] just so we can clarify why this was a thing lol. Not trying to stress you out."

72.     Despite Vaillancourt's representation that she was not "trying to stress [Monterio] out," she intentionally sent this message to Monterio to discriminate against Monterio for her pregnancy and to retaliate against Monterio for sending an email to human resources about her compensation.

73.     Vaillancourt then messaged: "As long as you are consistently meeting the 21 [hours] your [sic] scheduled for then we shouldn't've have to change anything."

74.     Although Vaillancourt knew that Monterio was pregnant, Monterio reminded her about this fact by stating:

> Thank you, and I'm sorry I'm just stressed because I just found out last month I'm pregnant, and it's been really hard. I've had a lot of nausea and throwing up unexpectedly, along with some heavy fatigue and really needing health insurance right now. The driving to and from [Weston, Massachusetts] has been really really hard[,] especially the way back up from Boston in stop and go traffic that jerking motion has been the absolute worst, that's why I really couldn't add that Saturday Arlington client, and I really don't want to move to part time and lose my health insurance.

**B.    ABACA increased the minimum hours requirement for maintaining full-time status.**

75.    On February 9, 2024, Vaillancourt emailed Monterio and other RBTs, stating that ABACA was increasing the minimum number of client-facing hours needed to be a full-time employee from twenty to twenty-five.

76.    Vaillancourt explained that ABACA was "[r]olling out a new system for full time employees to meet minimum of 25 client facing hours." She told RBTs that "[s]cheduling will be reaching out to add hours if you are not currently meeting minimum of 25 client facing. IF [sic] you are looking to stay full time then please be on top of that to keep track of your hours and reach out to your scheduler if you have any questions."

77.    Upon information and belief, the defendants intentionally increased the minimum hours needed to maintain full-time status to force Monterio to take on additional hours even though they knew she was pregnant and had difficulties driving long distances.

**C.    The defendants ignored Monterio's repeated requests for a reasonable accommodation.**

78.    On February 13, 2024, Monterio expressly asked Vaillancourt to accommodate her pregnancy-related symptoms by modifying her schedule.

79.    She sent Vaillancourt a text message, stating: "Hey Laura, I'm starting to feel really burnt out. Driving to and from [Weston] has grown worse, as my pregnancy symptoms haven't died down but increased."

80.     Vaillancourt responded: "Oh no, I'm sorry to hear that. I can work on removing you from [the] case but I do not have any immediate coverage . . . . This is not going to be easy and may take several weeks."

81.     Despite her assurances, Vaillancourt never followed through and did not engage Monteiro in an interactive dialogue about her schedule.

**D.    Rosario threatens to demote Monterio and terminate her health insurance benefits.**

82.     On February 21, 2024, just before Monterio was about to meet her next client, she suffered extreme abdominal pain, which was the side effect of her medication for pregnancy-related nausea and vomiting.

83.     Monterio contacted Vaillancourt to cancel her upcoming client appointment, but Vaillancourt said she needed to speak with Rosario directly.

84.     Monterio made several attempts to call Rosario to no avail.

85.     When Monterio finally reached Rosario, Rosario threatened to demote Monterio and take away her health insurance benefits.

86.     Rosario said: "I heard that you've been trying to remove hours with Laura and you had a conversation with her about that earlier. I know you need health care right now. Unless you want me to move you to part time, I'm not sure what you are going to do."

87.     Monterio expressed that she was currently in great pain, and stated that she would like to have this conversation later.

88.     Weeks passed before Rosario followed up with Monterio.

**E.    ABACA retaliated against Monterio for requesting a reasonable schedule modification as an accommodation for her pregnancy-related symptoms.**

89.    Notwithstanding Monterio's request to modify her schedule to accommodate her pregnancy-related symptoms, Vaillancourt and Rosario sought to make Monterio's schedule even more burdensome.

90.    On February 5, 2024, Vaillancourt asked Monterio to add an additional eight hours and fifteen minutes of client-facing time to her already full-time schedule. The client meetings were from 5:00 p.m. to 9 p.m. on Tuesdays and from 5 p.m. to 8 p.m. on Thursdays.

91.    Monterio responded:

"Thank you for thinking of me! I am not looking to add on another client hours right now, especially so late [in the evening] as this pregnancy has been taking a toll on me! Driving home in traffic up from [Weston, Massachusetts] has been really hard for my nausea and exhausting! Most night[s] I've been in bed by 8 just from fatigue! . . . it's been a lot . . . ."

92.    Vaillancourt responded: "[O]k thanks for the feedback."

93.    On March 11, 2024, Vaillancourt renewed her request to add additional client-facing hours to Monterio's schedule. She told Monterio that she wanted to add an additional ten hours and fifteen minutes of client-facing time to her already full-time schedule.

94.    Vaillancourt wrote: "Hello, [I] am looking to add a new client to your schedule for [T]uesdays 5-8 and [S]aturdays 10-515 here in [N]ashua, let me know if you have any questions."

95.    Monterio responded: "Hi, I am not interested in adding another client on top of the schedule I have now. I'm already staying with [the Weston client], after expressing how burnt out I feel driving so much . . . . You said you'd revisit this later, but I don't feel that is the truth."

**F.    After repeatedly ignoring her requests for a reasonable modification to her schedule, ABACA demoted Monterio because of her pregnancy.**

96.    On Sunday, March 17, 2024, Rosario texted:

I have been trying to get a hold of you about your hours. I may need to move you down to part time but I wanted to let you know first. I know Laura has been trying to get you to 25 hours (which is the recommendation for full time employees) but you have been denying taking more hours."

97.    Monterio responded: "I . . . do not understand why you are considering reducing my hours? I have been averaging 25 hours per week."

98.    Rosario responded that from January 29 through March 17, 2024, Monterio averaged 20 hours per week. Her calculation, however, did not take into account PTO, sick time, and clients ending their sessions early.

99.    Monterio replied: "I do not want to be demoted to a part-time schedule. I am willing to work a full-time schedule."

100.    On March 22, 2024, Monterio spoke on the phone with Rosario, who began the conversation by stating: "It sounded like you wanted to put up a case for why I shouldn't move you to part-time."

101.    Monterio responded by stating that she wanted to keep her full-time status, and she reiterated her request for a reasonable accommodation.

102.    She explained that the distance and travel time in the stop-and-go traffic to Weston, Massachusetts aggravated her pregnancy-related nausea and vomiting, and she asked to be reassigned, temporarily, to a closer client.

103.    Rosario denied the request explaining that traveling to Weston "is well-within your job description."

104.    Rosario further explained that even if she removed the Weston client from Monterio's schedule, she could not guarantee that Monterio's schedule "would not be worse."

105.    Rosario waited in silence for several moments before asking: "Do you want to work the [Weston client's] case, or do you want me to move you to part time?"

106.    Monterio said she needed to think about Rosario's ultimatum.

107.    On March 28, 2024, Monterio sent Rosario the following email:

Hi Liz,

I am writing to summarize the conversation we had over the phone last Friday. You said that, if I am unable to bill 25 hours per week, you will move me to part-time status. I told you that I am consistently scheduled for 23 hours per week, and my numbers are sometimes low because my clients have been cutting our appointments short.

We also discussed my Weston, MA client. I told you that it has been difficult, traveling to their appointment because they live an hour away. As I have said many times before, the drive to their house is

difficult because of my nausea and other symptoms from my pregnancy.

In early February, I asked to be assigned to a closer client due to my pregnancy symptoms. We discussed this on Friday as well. You stated that it would take several weeks to change my schedule and that I might be assigned to another client even further away.

I am now asking that you take this client off my schedule, and that I be assigned to another client, who is closer to me.

108.    Rosario responded to Monterio's email, stating:

I can not [sic] promise you we will have a client closer to what you have now. What I am saying is if we remove all this client from your schedule you will not have the hours to remain full time so we WILL have to move you to part time! . . . If I remove this client you will be moved to part time."

109.    Monterio replied: "Yes, I want to be removed from this client

because of my pregnancy symptoms."

110.    Rosario sent another email stating:

Ok no problem. I am just confirming that I will be removing this client from your caseload and moving you to part time. Moving you to part time means you will no longer receive benefits or accrue any time off. You will not lose the time off you have already accrued but will not accrue any more. Please confirm you understand and I will make that adjustment.

111.    Monterio responded: "I understand."

112.    Monterio was demoted to part-time status effective April 8,

2024. She received a letter which said, "As per company policy, employees

with a Part-Time status are not eligible for benefits. If you have been

previously enrolled in our benefits package, all enrollments will be

terminated as of 4/30/2024."

**VII.  Monterio was constructively discharged because she could not afford to continue working at ABACA on a part-time basis.**

113.    Monterio worked part-time from April 8 to July 2, 2024.

114.    During this time period, Monterio worked approximately ten hours per week.

115.    Despite ABACA's letter stating that all of her benefit enrollments will be "terminated as of 4/30/2024," Monterio was subsequently told that she would keep her health insurance benefits until the end of 2024.

116.    Monterio's average weekly take-home pay was approximately $250. With this income, she could not afford her benefits premiums or other expenses. This was especially burdensome because of her pregnancy.

117.    Monterio did not want to resign from her part-time position, just as she did not want to be demoted from her full-time position.

118.    On July 2, 2024, Monterio resigned from her part-time position at ABACA. She sent an email to Curran stating: "I am writing to formally resign from my position at ABA Centers of America effective Immediately. Since I was forced to move from full-time to part-time status, I cannot financially afford to continue working here. I cannot afford to work on a part-time basis, and I cannot afford my benefits premiums."

## COUNT I - SEX & PREGNANCY DISCRIMINATION
## 42 U.S.C. § 2000e-2; 42 U.S.C. § 2000gg-1; RSA 354-A:7
## (ABACA & ICBD)

119.    Monterio is a female individual.

120.    In December 2023, she learned that she was pregnant.

121.    On December 20, 2023, she told her supervisor, Rosario, that she was pregnant and that she had been suffering from nausea and vomiting as a result of her pregnancy. Shortly thereafter, Rosario shared this information with Vaillancourt.

122.    Within one week of the announcement, Rosario and Vaillancourt conspired to demote or terminate Monterio on account of her pregnancy.

123.    They began falsely claiming that Monterio was not working enough client-facing hours to maintain her full-time status and benefits.

124.    When they realized Monterio was in fact meeting the twenty client-facing hours requirement, ABACA increased the requirement from twenty to twenty-five client-facing hours.

125.    Over a period of several months, Monterio repeatedly asked Rosario and Vaillancourt to modify her schedule on a temporary basis as a reasonable accommodation for her pregnancy-related symptoms.

126.    Specifically, she asked Rosario and Vaillancourt to remove the Weston client from her schedule, and she asked to be assigned to a client closer to her residence.

127.    She explained that the hour-long drive to Weston, combined with stop-and-go traffic, had become unmanageable as a result of her pregnancy-related symptoms.

128.    Neither Rosario nor Vaillancourt engaged Monterio in any meaningful dialogue about her request to temporarily modify her schedule.

129.    Instead, they sought to make her schedule more burdensome.

130.    They offered clients that were geographically closer, but they did not offer to remove the Weston, Massachusetts client from her schedule.

131.    When Monterio requested reasonable accommodations, Rosario rebuffed her request, stating that traveling to Weston was "well-within [her] job description."

132.    Rosario also threatened to demote Monterio, stating: "I know you need health care right now. Unless you want me to move you to part time, I'm not sure what you are going to do."

133.    After repeatedly denying Monterio's requests for a reasonable accommodation, Rosario demoted Monterio on account of her pregnancy.

134.    As a result of the defendants discriminatory and retaliatory conduct, Monterio suffered lost income, lost work opportunities, emotional distress, and embarrassment.

## COUNT II - RETALIATION
### 42 U.S.C. 2000e-3(a); 42 U.S.C. 2000gg-2(f); RSA 354-A:19
### (ABACA & ICBD)

135.    Monteiro began working for ABACA on a part-time basis from April 8 to July 2, 2024 against her wishes to continue on a full-time basis.

136.    During this time period, she worked about ten hours per week.

137.    Even though ABACA sent Monterio a letter stating that her benefits would be "terminated as of 4/30/2024," she subsequently learned that she would keep her health insurance benefits until the end of 2024.

138.    During this time, Monterio's average weekly take-home pay was $250. With this income, she could not afford her premiums or other expenses.

139.    Monterio did not want to resign from her part-time position at ABACA, just as she did not want to be demoted from her full-time position.

140.    Nevertheless, she resigned from her part-time position at ABACA because she could not financially afford to continue working there.

141.    Monterio was constructively discharged when ABACA demoted her, continued to withhold income to pay for her benefits premiums, and only scheduled her to work ten hours per week—even when she was willing to work full-time with a reasonable accommodation.

142.    As a result of the defendants discriminatory and retaliatory conduct, Monterio suffered lost income, lost work opportunities, emotional distress, and embarrassment.

## COUNT III - WAGE THEFT
### 29 U.S.C. § 201 *et seq.*; RSA 275:53
### (ABACA & ICBD)

143.    ABACA had an official policy requiring its RBTs to clock-out during the workday for time spent traveling between client appointments.

144.    ABACA instructed Monterio to clock-out at the conclusion of one client appointment and to clock-in only after she travelled to and arrived at the next client appointment.

145.    ABACA intentionally scheduled gaps in Monterio's schedule so that it could avoid paying her the wages that she earned.

146.    On most days, Monterio was forced to clock-out and travel for work during the workday. As a result ABACA intentionally and knowingly failed to pay Monterio the wages that she was owed.

147.    As a result of the defendant's unlawful compensation practices, Monterio suffered lost income, emotional distress, and embarrassment.

## COUNT IV - RETALIATION
### 29 U.S.C. § 215(a)(3); RSA 275-E:2
### (ABACA & ICBD)

148.    Monterio sent a message to ABACA human resources department reporting that ABACA was not properly compensating her for the time she spent traveling between client appointments during the workday.

149.    In retaliation for sending this email, Rosario and her assistant, Vaillancourt, conspired to demote or terminate Monterio.

150.    They began falsely claiming that Monterio was not working enough client-facing hours to maintain her full-time status and benefits.

151.    Within one month of realizing that Monterio was in fact meeting the twenty client-facing hours requirement, ABACA increased the minimum requirement to twenty-five client-facing hours.

152.    After many months of efforts, the defendants demoted Monterio in retaliation for asking human resources about her compensation.

153.    As a result of the defendants unlawful and retaliatory conduct, Monterio suffered lost income, lost work opportunities, emotional distress, and embarrassment.

## COUNT V - AIDING & ABETTING
### RSA 354-A:7
### (Curran & Rosario)

154.    Curran and Rosario are liable as aiders and abettors.

155.    Curran, as the Executive Director, knew of Rosario's and Vaillancourt's sex and pregnancy discrimination and retaliation, and he permitted it to continue in retaliation for Monterio's contacting human resources about ABACA's failure to compensate her for time spent traveling during the workday

156.    Rosario actively participated in the discrimination and retaliation by instructing her assistant, Vaillancourt, to harass Monterio about her schedule.

157.    She also threatened to demote Monterio, take away her benefits, and ignored her requests for reasonable pregnancy-related accommodations.

158.    Curran and Rosario performed this conduct while working in a supervisor capacity at ABACA.

159.    As a result of their discriminatory and retaliatory conduct, Monterio suffered lost income, lost work opportunities, emotional distress, and embarrassment.

WHEREFORE, Monterio respectfully requests that this honorable Court:

A.    Award back pay and benefits;

B.    Award front pay and benefits;

C.    Award compensatory damages;

D.    Award enhanced compensatory damages;

E.    Award liquidated, exemplary, and punitive damages;

F.    Award any other statutory damages;

G.    Award costs, attorney's fees, and interest; and

H.    Grant any other relief this Court finds is just and equitable.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Monterio demands a trial by jury on all issues so triable.

Respectfully submitted,

MIRABELLA MONTERIO

By her attorneys,

DEVINE, MILLIMET & BRANCH, P.A.

Dated: June 4, 2025          By: /s/ Richard P. Driscoll
                             Richard P. Driscoll (Bar No. 273678)
                             111 Amherst Street
                             Manchester, NH 03101
                             (603) 669-1000
                             rdriscoll@devinemillimet.com